## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| FTX TRADING LTD., ALAMEDA RESEARCH LTD., WEST REALM SHIRES, INC., WEST REALM SHIRES SERVICES, INC., AND NORTH DIMENSION INC. | |
| Plaintiffs, | Adv. Pro. No. 24-_____(JTD) |
| - against - | |
| AMERICAN ACTION NETWORK, INC., | |
| Defendant. | |

### COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS
### PURSUANT TO 11 U.S.C. §§ 105, 544, 548, AND 550
### AND DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305

Plaintiffs FTX Trading Ltd. ("FTX"), Alameda Research Ltd. ("Alameda"), West Realm Shires, Inc. ("WRS"), West Realm Shires Services, Inc. ("WRSS"), and North Dimension Inc. ("North Dimension" together with FTX, Alameda, WRS, and WRSS, the "Plaintiffs") through their undersigned counsel, for their Complaint against American Action Network, Inc. (the "Defendant"), allege the following based upon personal knowledge and upon their

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

investigation to date as to themselves and their own acts, and upon information and belief as to all other matters:

## NATURE OF THE CASE

1.      Plaintiffs bring this adversary proceeding pursuant to Sections 105, 544, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2) and 1305, to avoid and recover from the Defendant, or from any other person or entity for whose benefit the transfers were made, all transfers of property of Plaintiffs to the Defendant, prior to commencement of the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case"), by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor").

2.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been appointed for Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022 [D.I. 128].  Accordingly, Plaintiffs have the authority to file this Complaint to commence, and thereafter to prosecute, this adversary proceeding.

3.      Plaintiffs have determined, based on their analysis and investigation to date, that the following transfers to the Defendant are avoidable under the Bankruptcy Code and Title 6 of the Delaware Code:

| Dates | Amount of Transfer | Transferor |
|---|---|---|
| June 13, 2022 | $800,000.00 | North Dimension |
| July 1, 2022 | $1,000.000.00 | North Dimension |
| July 11, 2022 | $1,000,000.00 | North Dimension |

4.     During the course of this adversary proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made to or obligations incurred by Plaintiffs to Defendant that are avoidable under the Bankruptcy Code.  Plaintiffs intend to avoid and recover all such transfers made to or obligations incurred by Plaintiffs to or for the benefit of Defendant or any other transferee and accordingly reserve the right to amend this Complaint.  In particular, and without intending to create any limitation, Plaintiffs reserve the right to amend this Complaint to include:  (i) further information regarding relevant transfers or obligations; (ii) information regarding additional transfers made or obligations incurred; (iii) additional plaintiffs; (iv) modifications of and/or revisions to the Defendant's name; (v) additional defendants; and (vi) additional causes of action that may become known at any time during this adversary proceeding, through formal discovery or otherwise.

## THE PARTIES

5.     Plaintiff FTX is a corporation registered in Antigua and Barbuda.  Its principal place of business was in Nassau, Bahamas.  FTX and its subsidiaries and affiliate entities collectively did business as FTX.com and operated a digital asset trading exchange.  FTX is 80% owned by Paper Bird Inc., a Delaware corporation that is wholly owned by Samuel Bankman-Fried ("Bankman-Fried").

6.     Plaintiff Alameda is a British Virgin Islands company limited by shares.  It is a wholly-owned subsidiary of Debtor Alameda Research LLC ("Alameda LLC"), a Delaware

limited liability company that is 90% owned by Bankman-Fried and 10% owned by Zixiao "Gary" Wang.

7.      Plaintiff WRS is a Delaware corporation 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Nishad Singh, and 22.25% owned by other shareholders.

8.      Plaintiff WRSS, doing business as FTX.US, is a Delaware corporation and a wholly owned subsidiary of Plaintiff WRS.

9.      Plaintiff North Dimension is a wholly owned subsidiary of Debtor Alameda LLC.

10.     Defendant American Action Network, Inc. is a Delaware corporation with its principal place of business at 1747 Pennsylvania Avenue NW, 5th Floor, Washington, DC 20006.

## OTHER RELEVANT PERSONS

11.     Bankman-Fried is one of the founders of the FTX Group.[2]  He co-founded Plaintiff Alameda in 2017 and served as its Chief Executive Officer through late 2021.  During 2019, he founded FTX.  In 2020, he established a separate group of operating entities that operated a digital asset exchange for U.S. persons, FTX US.  At all relevant times, Bankman-Fried was the ultimate majority owner, and effectively controlled the operations, of Plaintiffs and their affiliated Debtors.

12.     Nishad Singh was FTX's former Director of Engineering and held ownership stakes in various FTX Group companies.

13.     Zixiao "Gary" Wang was a co-founder of FTX and its former Chief Technology Officer and held ownership stakes in various FTX Group companies.

---

[2]     The "FTX Group" is comprised of four silos. These silos include: (a) a group composed of Debtor West Realm Shires, Inc., Debtor West Realm Shires Services, Inc., and their Debtor and non-Debtor subsidiaries; (b) a group composed of Debtor Alameda Research Ltd., Debtor Alameda LLC, and their Debtor subsidiaries; (c) a group composed of Debtors Clifton Bay Investments LLC, Clifton Bay Investments Ltd., Island Bay Ventures Inc. and FTX Ventures Ltd.; and (d) a group composed of Debtor and Plaintiff FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

14.     Caroline Ellison was the co-CEO of Plaintiff Alameda LLC from August 2021 until September 2022, when she was named the sole CEO and director.

15.     Each of Bankman-Fried, Singh, Wang, and Ellison was an "<u>FTX Insider</u>" and are together the "<u>FTX Insiders</u>."

16.     Ryan Salame ("<u>Salame</u>") is the former chief executive officer of FTX Digital Markets Ltd.

**<u>JURISDICTION AND VENUE</u>**

17.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

18.     This adversary proceeding arises from and relates to the Chapter 11 Cases filed with this Court on the Petition Date.

19.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

20.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

21.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

22.     The statutory predicates for the relief requested herein are Sections 105(a), 544, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

23.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined

that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**FACTUAL ALLEGATIONS**

**I.      The FTX Insiders' Fraudulent Scheme.**

24.      Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations"); the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242-1]; and the *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704-1] (the "Second Interim Report").

25.      The FTX Insiders, among others, took advantage of the FTX Group's lack of controls and recordkeeping to perpetrate a massive fraud—lavishly spending the FTX Group's assets on, among other things, private homes and jets, political and "charitable" contributions, and various investments.

26.      All of the FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that facilitated the transactions described herein.  On

December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering. *See* Min. Entry, Dec. 19, 2022, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. 2022).   On September 24, Ellison was sentenced to two years in prison.  Min. Entry, Sept. 24, 2024, *United States v. Ellison*, No. 22-cr-00673 (S.D.N.Y. 2022).   Singh pleaded guilty to the same felonies and an additional charge of conspiracy to violate campaign finance laws, on February 28, 2023. *See* Min. Entry, Feb. 28, 2023, *United States v. Bankman Fried*, No. 22-cr-00673 (S.D.N.Y. 2022).   On November 2, 2023 a jury found Bankman-Fried guilty of multiple felonies for defrauding customers, lenders, and investors, including conspiracies to commit wire fraud, wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.  On March 28, 2024, Bankman-Fried was sentenced to 25 years in prison.

27.      In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda and its affiliates "special privileges on the FTX platform," including to allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat (*i.e.*, government-issued) currencies and cryptocurrencies.   Plea Tr. at 24:6-10, *United States v. Wang*, No. 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21.   Using these "special privileges," the FTX Insiders frequently caused FTX Group entities, including Plaintiffs, to misappropriate funds from the FTX exchanges for their own benefit, including to make speculative investments for which they overpaid, and political and charitable donations.

28.      Before his conviction, Bankman-Fried repeatedly, and publicly, claimed that Alameda LLC operated as "a wholly separate entity" from FTX.com.  Annie Massa et al., *Sam*

*Bankman-Fried and Alameda CEO Caroline Ellison Spoke About Red Flags 3 Months Before It Collapsed.   Here's What They Said – and How They Lied*, Fortune (Nov. 18, 2022), https://fortune.com/2022/11/18/sam-bankman-fried-alameda-ceo-caroline-ellison-spoke-red-flags-ftx-3-months-before-it-collapsed-what-said-how-lied/.   Ellison was quoted as saying that "[w]e keep [FTX and Alameda] quite separate in terms of day to day operations." *Id*.   In reality, Alameda LLC routinely looted "several billion dollars" from FTX.com using its "special privileges," thereby defrauding FTX.com's creditors.   Plea Tr. at 28:23–29:2, *United States v. Singh*, No. 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102 ("Singh Plea Tr."); Plea Tr. at 24:6–10, *United States v. Wang*, No. 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21.

29.     The FTX Insiders were aware at all relevant times of the "special privileges on the FTX platform" and that Alameda LLC was "borrowing" (*i.e.*, looting) billions of dollars from FTX.com in order to, among other things, finance sham "loans" from Alameda to the FTX Insiders. Ellison admitted to being aware of this arrangement from 2019 through 2022, which she described as "permitt[ing] Alameda access to an unlimited line of credit without being required to post collateral, . . . pay interest . . . or being subject to margin calls or FTX.com's liquidation protocols." *Id*. at 27:11–15.

30.     Testimony from the FTX Insiders during Bankman-Fried's criminal trial further clarified the fraudulent relationship between Alameda and FTX, and the scheme pursuant to which the FTX Insiders misappropriated customer funds.   For example, Singh testified he and Wang implemented the "allow negative feature" which granted Alameda the ability to "go negative without any balance" such that Alameda was not "bounded by its collateral limit." *See, e.g.*, Trial Tr. at 1362:25–1363:10, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Oct. 16, 2023) ("Bankman-Fried Trial Tr."). When Singh confronted Bankman-Fried about the growing

hole caused by Alameda's exchange privileges, Bankman-Fried responded that the "main plan remains, making FTX successful and growing it." *Id.* at 1411:3–1412:10. FTX.com's former General Counsel also testified that Bankman-Fried told Singh that the hole "is what it is and there is nothing we can do about it.  The only thing we can do is grow the company and fill the hole." *Id.* at 1964:12–1965:5.

31.    Ellison testified that Bankman-Fried's strategy was for Alameda to borrow "as much money as [it] could get from whatever sources [it] could find at whatever terms [it] could get" and to "make a lot of investments, potentially in the billions of dollars of venture investments in . . . relatively early-stage companies." *Id.* at 693:4–17.  Ellison also explained that she "learned that FTX had loaned money that it had raised from investors totaling $1.6 billion to Alameda," which "had been concealed from FTX's auditors." *Id.* at 937:12–14.  Ellison testified that when an Alameda lender called an open term loan, Bankman-Fried directed her to "prepare alternative ways of presenting the information" and "come up with ways to conceal things in [their] balance sheet that [they] both thought looked bad." *Id.* at 786:13–25.

32.    In the days leading up to the Petition Date, Ellison messaged Bankman-Fried that she "had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening it just feels great to get it over with[,] one way or another." *See* Superseding Indictment ¶ 53, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.

## II.    The FTX Insiders Defrauded Customers and Other Creditors of the FTX Group To Make "Political Contributions."

33.    Bankman-Fried was aware at all relevant times of Alameda's special privileges on FTX's platform that had been encoded by Wang, and was aware that Alameda was borrowing billions of dollars from FTX.com in order to, *inter alia*, finance "loans" from Alameda to

Bankman-Fried himself, or to make putative "donations" to causes favored by him—including to entities he controlled.

34.     At the direction of Bankman-Fried, Ellison, Wang, and Singh, the FTX Group papered "loans" to FTX executives, including hundreds of millions of dollars earmarked for political contributions and speculative investments in other companies.  Bankman-Fried directed Singh, Salame, as well as other FTX Insiders and FTX executives to make political donations using Debtors' assets as straw donors to conceal the identity of the true donor, Bankman-Fried. The FECA, 52 U.S.C. § 30101 *et seq.*, prohibits people from making conduit contributions, *i.e.*, those "in the name of another person" or "knowingly permit[ing] [their] name to be used to effect such a contribution," *id.* § 30122, and prohibits corporations from making contributions, *id.* § 30118.

35.     For example, by design of Bankman-Fried, Salame primarily made contributions to Republican candidates or Republican-affiliated PACs or super-PACs.  Records identified by the Debtors show that Salame served as a conduit or "straw donor" for Bankman-Fried's donations to Republican Party candidates, which Bankman-Fried and Salame sought to obscure, and that Salame was rewarded for his participation in this scheme.  Through this scheme, Salame made millions of dollars in political contributions in his own name to Republican Party candidates and causes as a straw donor to conceal the identity of the true donor, Bankman-Fried, in violation of campaign finance laws.  *See, e.g.*, Bankman-Fried Trial Tr. at 1422:19–1423:3.  Salame pled guilty to conspiracy to violate campaign finance laws.  Salame stated at his plea hearing that the "tens of millions of dollars in campaign contributions" he made in his name were "funded by transfers from the bank accounts of an Alameda subsidiary."  Plea Tr. at 21:19–23, *United States v. Salame*, No. 22-cr-00673 (S.D.N.Y. Sept. 7, 2023), ECF No. 283.  He acknowledged that "[w]hile at the time

these funds were categorized in both [his] and Alameda's ledgers as loans," he "understood then that the loans would eventually be forgiven and [he] never intended to repay them." *Id.* at 21:23–25, 22:1–5.

36.     Singh also pleaded guilty to conspiracy to violate campaign finance laws.  Singh testified at Bankman-Fried's criminal trial that he made "political donations" "in my name, using my bank account" using "funds deposited straight from Alameda."  *See* Bankman-Fried Trial Tr at 1420:19–25.  Singh explained that "[f]unds would start out with Alameda at some bank account.  They would get transferred into -- wired to my Prime Trust account, which is another bank account, and then Ryan [Salame] would request a wire withdrawal from my bank account to the campaign as a destination, and I would click OK in my email."  *Id.* at 1430:3–7.  Singh also testified that the "wires from Alameda" into his bank account used for the donations were coming from "[c]ustomers."  *See id.* at 1433:15–25 ("There was an enormous hole, I knew, deficit in funds at FTX for customers, and Alameda sort of also had that hole.  It was theirs to fill.  Alameda sending me money to spend, as opposed to keeping money for customers, say, necessarily deepens that hole and is drawing on funds that would have otherwise gone to customers.").

37.     The funds used to make these political contributions were often transferred from the same Alameda and North Dimension bank accounts to which FTX customers sent funds to be credited to their accounts on the FTX exchanges.  *See* Second Interim Report at 24–25.  The FTX Insiders then used these funds misappropriated from Alameda to make exorbitant political donations, ingratiating themselves and their affiliated companies with politicians and lobbyists, thereby furthering both their efforts to grow the FTX Group with minimal political oversight, and the FTX Group's image as a healthy, trustworthy, and successful group of companies.  Indeed, at his criminal trial, Bankman-Fried admitted that "it would be good for FTX public relations to

spend millions of dollars in donations each year." *See* Bankman-Fried Trial Tr. at 2642:21–2643:4. Singh, who pled guilty to violations of campaign finance laws by agreeing to make donations funded by Alameda, stated that he "did not select the candidates and the political action committees who received the donations" and that "the donations were in part for the benefit of Sam Bankman-Fried and FTX and their ability to be politically influential." Singh Plea Tr. at 33:7–14.

### III. Transfers of Debtors' Funds to Defendant.

38.     Defendant was incorporated in 2009 as a 501(c)(4) nonprofit corporation as an "action tank" organized to promote "center-right policies." AMERICAN ACTION NETWORK, https://www.americanactionnetwork.org/about-aan (last visited Oct. 28, 2024).

39.     On or about May 25, 2022, Plaintiff North Dimension transferred $5,500,000.00 from a Silvergate Bank account containing commingled customer assets held in its name to a Signature Bank account held in the name of Salame. On or about June 13, 2022, Salame then transferred $800,000.00 of Plaintiffs' assets from a Signature Bank account held in his name to Defendant (the "June 13 Transfer").

40.     On or about July 1, 2022, Plaintiff North Dimension transferred $5,000,000.00 from a Silvergate Bank account containing commingled customer assets held in its name to a Signature Bank account held in the name of Salame. On or about the same day, Salame then transferred $1,000,000.00 of Plaintiffs' assets from a Signature Bank account held in his name to Defendant (the "July 1 Transfer").

41.     On or about July 11, 2022, Plaintiff North Dimension transferred $5,000,000.00 from a Silvergate Bank account containing commingled customer assets held in its name to a Signature Bank account held in the name of Salame. On or about the same day, Salame then transferred $1,000,000.00 of Plaintiffs' assets from a Signature Bank account held in his name to

Defendant (the "<u>July 11 Transfer</u>" together with the June 13 Transfer and July 1 Transfer, the "<u>Transfers</u>").

42.    The Transfers to Defendant, which were funded by Debtors' assets containing commingled customer assets, were initiated by FTX Insiders via transfers from Debtor accounts before being subsequently transferred to an account held by Defendant.  The Transfers were neither investments nor was there any expected value or return to any of the Plaintiffs for the transfer of Plaintiffs' assets to Defendant. The Transfers from the Plaintiffs to Salame to Defendant were part of a single integrated transaction whereby funds that were property of the Debtors were transferred to Defendant.

43.    The Transfers to Defendant were part of an integrated plan by the FTX Insiders to siphon money from FTX Group creditors and enhance their own personal reputations at the expense of creditors.

44.    The Transfers were also part of a carefully coordinated and deliberate scheme by Bankman-Fried to violate federal campaign finance law through the use of "straw men" donors.

### B.    The Transfers to Defendant Involved Multiple Badges of Fraud Evincing Actual Intent to Hinder, Delay, or Defraud Creditors.

45.    As set forth above, multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the Transfers to Defendant, including that:

    i.    Numerous material facts relating to the Transfers were concealed, including the source of the assets ultimately transferred to Defendant, the purpose of the Transfers, and the fraudulent scheme pursuant to which the Transfers were made;

    ii.    Bankman-Fried and the FTX Insiders removed or concealed Plaintiffs' assets;

    iii.    The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred;

    iv.    Plaintiffs were insolvent when, or became insolvent shortly after, the Transfers were made; and

v.    The Transfers occurred shortly before or shortly after Plaintiffs incurred substantial debts.

## CAUSES OF ACTION

### COUNT ONE
### FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(A)

46.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 45 as if fully set forth here.

47.    Plaintiffs transferred their assets to Salame who then made the Transfers set forth above at Paragraph 3 to the Defendant.

48.    Each of the Transfers to the Defendant was a transfer of property of Plaintiffs.

49.    Each of the Transfers was made with the intent to hinder, delay, or defraud present or future creditors.

50.    Accordingly, each of the Transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from the Defendant the full amount of the Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT TWO
### FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(B)

51.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 45 as if fully set forth here.

52.    Plaintiffs transferred their assets to Salame who then made the Transfers set forth above at Paragraph 3 to the Defendant.

53.    Each of the Transfers to the Defendant was a transfer of property of Plaintiffs.

54.    Plaintiffs did not receive reasonably equivalent value in exchange for any of the Transfers.

55.    The Plaintiffs:  (1) were insolvent on the date that each of the Transfers were made; (2) became insolvent as a result of the Transfers; (3) engaged or were about to engage in a business or a transaction for which the remaining assets of the Plaintiffs were unreasonably small in relation to the business or transaction; or (4) intended to incur, or believed that they would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiffs' ability to repay as such debts became due.

56.    Accordingly, each of the Transfers made by Plaintiffs to the Defendant should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from the Defendant the full amount of the Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT THREE
## FRAUDULENT TRANSFERS PURSUANT TO
## DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)

57.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 45 as if fully set forth here.

58.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

59.    Plaintiffs transferred their assets to Salame who then made the Transfers set forth above at Paragraph 3 to the Defendant.

60.    Each of the Transfers to the Defendant was a transfer of property of Plaintiffs.

61.     Each of the Transfers to the Defendant was made with the intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims.

62.     Accordingly, each of the Transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from the Defendant the full amount of the Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FOUR**
**FRAUDULENT TRANSFERS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305 AND 11 U.S.C. § 544(b)**

63.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 45 as if fully set forth here.

64.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

65.     Plaintiffs transferred their assets to Salame who then made the Transfers set forth above at Paragraph 3 to the Defendant.

66.     Each of the Transfers to the Defendant was a transfer of property of Plaintiffs.

67.     Plaintiffs did not receive reasonably equivalent value in exchange for any of the Transfers.

68.     The Plaintiffs:  (1) were insolvent on the date that each of the Transfers were made; (2) became insolvent as a result of the Transfers; (3) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiffs were unreasonably small in relation

to the business or transaction; or (4) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiffs' ability to repay as such debts became due.

69.    Each of the Transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the Transfers.

70.    Accordingly, each of the Transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from the Defendant the full amount of the Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FIVE**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)**

71.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 45 as if fully set forth here.

72.    As alleged above, Plaintiffs are entitled to avoid each of the Transfers to the Defendant addressed herein under Sections 544 and 548 of the Bankruptcy Code.

73.    Because the Defendant is initial transferee, subsequent transferee or the entity for whose benefit such transfer was made, Plaintiffs may recover from the Defendant the full value of the Transfers pursuant to 11 U.S.C. § 550(a), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT SIX**
**UNJUST ENRICHMENT**

74.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 45 as if fully set forth here.

75.    As a result of the Transfers to Defendant, Defendant was unjustly enriched by the receipt of the funds.

76.     Any and all benefits obtained by Defendant as a consequence of the Transfers to Defendant were funded by Plaintiffs.  However, Plaintiffs received no benefit in exchange for the Transfers.

77.     Plaintiffs lack an adequate remedy at law against Defendant's unjust enrichment at Plaintiffs' expense.

78.     Plaintiffs seek to recover from Defendant all payments received from Defendant made using money from Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

79.     Enter an order that the Transfers addressed herein are avoidable fraudulent transfers under 11 U.S.C. §§ 544 and 548 and Del. Code Ann. tit. 6, §§ 1304 and 1305;

80.     Award Plaintiffs under 11 U.S.C. § 550 no less than $2,800,000.00 (plus the value of any additional avoidable transfers that Plaintiff learns, through formal discovery or otherwise, were made to the Defendant during the Avoidance Period);

81.     Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs of suit; and

82.     Award Plaintiffs all other relief, at law or equity, to which it may be entitled.

Dated: November 8, 2024
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail:  landis@lrclaw.com
        cobb@lrclaw.com
        mcguire@lrclaw.com
        robertson@lrclaw.com